UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLHASSEE DIVISION

UNITED STATES OF AMERICA

Vs.                                          CASE NO: 4:99cr016-RH

MARK ANTHONY JONES

### MOTION TO VACATE AND SET ASIDE CONVICTION AND SENTENCE

Now comes, Mark Anthony Jones, defendant in pro se, and pursuant to Federal Rules of Civil Procedure, Rule 60(b)(6), and hereby move this Honorable Court to vacate and set aside the conviction and sentence in the abovestyled cause. Defendant avers, within the attached memorandum in support, incorporated herein by reference that this court did not have jurisdiction to sentence him pursuant to section 841 (b)(1)(A)(iii).

Wherefore defendant submit this must grant his motion to vacate and set aside the conviction and imposed sentence.

Respectfully Submitted

Mark Anthony Jones
defendant, in pro se
register No: 10997-017
Federal Correction Com.
Post Office Box-1032
Coleman-Medium
Coleman, FL 33521-1032

2005 SEP -9 AM II: 28

FILED

Mark Anthony Jones was charged in a three count indictment returned in the Notthern District of Florida on March 2, 1999, Count One of the indictment charged that Jones distributed cocaine base on january 15, 1999, in violation of § 21 U.S.C. sec. 841(a) and 841(b)(1)(B)(iii). Count Two of the indictment charged that Jones distributed cocaine base on February 3, 1999, in violation of § 21 U.S.C. sec. 841(a) and 841(b)(1)(B)(iii). Count Three of the indictment charged that Jone distributed cocaine base on February 12, 1999, in violation of § 21 U.S.C. sec 841(a) and 841(b)(1)(A)(iii). Count One and Two are class B felonies, Count Three is a class A Felony.

Jones was arrested on February 12, 1999. He was detained pending trial. On May 14, 1999, Jones entered into a written plea agreement with the government. Jones agreed to plead guilty to count three of the indictment and the government agreed to dismiss count one and two at the time of sentencing.

On July 29, 1999, the defendant was sentence to life imprisonment and 120 month(s) supervised release.

At the time Congress established separate penalities for cocaine base/ crack cocaine under 21 U.S.C. Section 841(b)(A), (B) and (C) in 1986, cocaine base was a new drug that had never been scheduled as a controlled substance as is required by 21 U.S.C. Section 811 and 812 (defined in 21 U.S.C. Section.802 (5)(6). Accordingly, the Court did not have jurisdiction to sentence Jones pursuant to Section 841(b)(1)(A)(iii). Furthermore, Congress never had the authority to simply penalize the use and distribution of a substance that was not scheduled (1) the plain language of Section 811 and 812 demands scheduling by the Attorney general in conformance with the procedures set forth in those statues. Touby v. U.S.;500 U.S. 160 (1991); (2) the 1986 legislation unconstitutionally infringes on a statutory created executive function and thereby violated the separation of government

1

power protected by the United States Constitution; and (3) because the Controlled Substances Act guarantees much more than simple notice of the substance subject to prosecution and sentencing, the failure to schedule cocaine base, crack cocaine, violates Jones due process rights under the Fifth Amendment.

Jones was convicted pursuant to Title § 21 U.S.C. 841(a)(1). The statute provides:

> Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intention-ally---
>
> (1) to manufacture, distribute, or dispense,distribute, or possess with intent to manufacture,distribute, dispense a controlled substance;...
> (Emphasis added).

Jurisdiction of the court is gained only by ademonstration that the corpus delicti of the manufacture, distribution, or possession with intent to perform the above acts is a "controlled substance" see, e.g., United States v. Caudle, 828 F.2d 1111, 1112 (5th Cir. 1987)(defendant clearly could not be indicted for distributing substances'). Therefore, the question here is whether cocaine base/crack cocaine are controlled substances under the deffinitions and statutes:

1. "Control means to add a drug or other substance to a schedule. § 21 U.S.C. sec. 802(5).

2. "Controlled Substance" means a drug or other substance, or immediate precursor, included in schedule I, II, III, IV, or V of part B of this subchapter [of the Controlled Substance Act of 1970]. (hereinafter, "C.S.A."). § 21 U.S.C. sec. 802.

3. "Drug" which is the phenotype of controlled substance addressed here, is  statutorily defined within the C.S.A. by express adoption from the Food, Drug and Cosmetic Act (hereinafter, "F.D.C.A.") definition,

§ 21 U.S.C. 321(g)(1):

> "The term 'drug... means (c) articles (other than food) of man or other animal...'"

See § 21 U.S.C. 802(12).

4. "New Drug" is not expressly defined within the Controlled Substance Act of 1970 or its later amendments. However, the legal definition is also available from § 21 U.S.C. 321(p), of the F.D.C.A. which has been adopted by the C.S.A. (infra), and which admits two categories:

> (1) "Any drug the composition of which is such that such drug is not generally recognized among experts who are qualified by scientific training and effectiveness of drugs as safe and effective under the conditions prescribed..."

> (2) "Any drug the composition of which is such that such drug as aresult of investigation to determine its safety and effectiveness for use under such conditions has become so recognized.

> "But which has not, otherwise than such investigations, been used to a material extent or for a material time under such conditions."

The above criteria are phenomenological, not chemical. New attaches automatically to any substance used as a drug whenever there is (1) not enough practical experience in existence to adequately know its properties and effects, or (2) not enough examination in controlled circumstances to adequately make predictions as to its likely properies and effects.

The decision whether a drug substance is "new" and therefore one of the "future drugs" for which C.S.A. made the provision for further scheduling, resides solely with the Department of Health and Human Services (hereinafter "H.H.S."), not the D.O.J. Its is a scientific determination and not purely a legal one.

> The Commission recommend  that a unit be established within the department of Health, Education, and Welfare [now H.H.S.] to determine the safety and efficacy of and to regulate all narcotic and dangerous drugs capable of producing severe psychotropic effects, which can lead to criminal or

3

> lawless behavior when abused." recommendation
> No. 10 of the Prettyman Commission.
>
> "Under reorganization Plan No. 1, a Bureau of nar-
> cotics and dangerous drugs (hereinafter "B.N.D.D.)
> has been established in the Department of Justice
> to regulate all these drugs [including legitimate
> activities]. Safety and efficacy will contiune to
> be regulated under the F.D.C.A.. by the Department
> of Health, Education and welfare." House report
> 91-1444, response to recommendation No. 10., p 18.

This is presently the work that the professionals, of the New Drug
Application Office, (N.D.A.O. unit of the Food an Drug Administration)
perform routinely for H.H.S.

Cocaine Base Has been Legally Decided To Be A New Drug Substance
And Therefore Warrants Scheduling:

1. The semantic confusion which can potentially occur in this schedul-
ing debate is to mistake a "mixture" for a "substance".

> "Substance means [a] distinguishable kind of physical
> matter." Third New International Dictionary, 2279 4(b)
> (1). [mixture does not]. United States v. Bishop, 894
> F.2d 981 (8th Cir. 1990).

Proponents of the status quo are committing a classical fallacy
of logic by sub rose presuming the concept of cocaine as mixture when the
subject is scheduling and then switching to cocaine base as substance when
the subject is punishment. Unless expressly provided for, statutory constr-
uction only allows for one definitional meaning at a time within a stat-
utory scheme.

> If a statute defines a term in its definitional
> section,then that definition controls whenever
> that term appears in the Act." United States v.
> Turkett, 452 U.S. 576, 580, 101 S.Ct. 2524, 69
> L.Ed2d 246 (1981).

The C.S.A. consistently utlilzes the term "substance" whenever address-
ing scheduling and the malum prohibitum. Scheduling is properly concerned
with time difference in psychotropic and physiological properties of the

4

whole substance consumed.

2. The Area of Drug Control Law-Making Demands Strict Compliance With Statutory Definitions And Established Procedure.

Title 21 U.S.C. § 811-812 is an area of administrative law-making to which severe criminal penalties attach. Strict compliance is therefore demanded from the definitions and procedures implementing any criminal regulations. United States v.. Merksky, 361 U.S. 431, 440, 80 S.Ct. 459, 4 L.Ed2d 423, 431 (1960).(the inherent  due process protection in regulatory law-making derives from strict adherence to the statutory purpose and strict compliance with procedures.

That the laws under discussion in this motion are specifically in the genre of those subject to the treatment under merksky does not remain to be established:

> "The federal Food, Drug, and Cosmetic Act (21 U.S.C.
> § 301, et seq.) is a detailed piece of legislation
> whose treatment of many health and food problems is
> quite specific; and it is the duty of the Courts in
> construing it to be mindful of its approach in terms
> of draftminship." Fleming v. Florida Citrus Exchange,
> 368 U.S. 153, 78 S.Ct. 160, 3 L.Ed2d 188 (1958).

In the portion of this Title embraced by § 801, et seq., i.e., the Control Substance Act of 1970, the same precision which guides the rest of the Food and Cosmetic Act has been expressly adopted for the scheduling of substances which renders them "controlled" to the public:

> "When adding a substance to a schedule, the Attorney
> General must follow specified procedures. First the
> Attorney General mustrequest a scientific evaluation
> from the secretary of health and human services (HHS),
> together with a recommendation as to whether the sub-
> stance would be controlled. A substance cannotbe con-
> trolled if the secretary recommends against it. 21
> U.S.C. § 811(b). Second, the Attorney General must
> consider eight factors with respect to the substance,
> including its potential for abuse, scientific evidence
> of its phharmacological effect, its psychic or physio-
> logical dependence liability, and whether the substance
> is an immediate precursor of a substance already con-
> trolled. 21 U.S.C., § 811(c). third, the Attorney
> General must comply with the notice-and-hearing pro-

> visions of the Administrative Procedure Act(APA), 5
> U.S.C., § 551-559, which permit comment by interested
> parties. 21 U.S.C., § 811(c). In addition, the Act
> permits any aggrieved person to chhallenge the schedu-
> ing in a Court of Appeals. § 507, 21 U.S.C. § 877"
> Touby v. United States,500 U.S. 160, 162-163, 111
> S.Ct. 1752, 114 L.Ed2d 219, 225 (1991).

Everything that has been done in the area of cocaine base/crack cocaine
regulation to date, therefore, has been done not beginning with omitting
the legal procedures, but without even the essential scientific-medical
prerequisites required of the Secretary of health and human Services.
Since the whole process begins with the technical drug evaluation, the
treatment of cocaine base and crack have been fatally flawed from the out-
set.

3. Strict Compliance Only Allows Scheduling Of New Drug Substance As
Whole Drugs:

As legal entites, drugs must be addressed as a whole and not merly as
some "active ingredient" mixed with other ingredients:

> "The term 'drug' is plainly broad enough to
> include more than just active ungredients,
> and also that they must do so unless sub-
> section 321(g)(1) is to be superfluous."
> United States v. Generix Drug Corporation,
> 460 U.S. 453, 459, 103 S.Ct. 1298, 75 L.Ed2d
> 198, 204 (1983) (Emphasis in original).

Whether a substance is a legally new drug, therefore, is a question of whet-
her its general behavior within practical norms is different from that of
compositions used as a drug in the past. In this regard, the Generix Court
acknowledged the potential affects of the presence or absence of "excipient
ingredients" Id., United States v. Generix,460 U.S. at 455.

The Generix Court further held that the "whole drug" principle was
required throught the entirety of the Food, Drug and Cosmetic Act. see
Generix, supra,460 U.S. at 459 (product adulteration, § 351(a)(4)); prod-
uct misbranding label to include all ingredients, "whether active or not'),
§ 502(e); New Drug Application (must contain "a full list of articles used

6

as componets of such drug"), § 505(b) and so on. And the F.D.C.A froms the definitional basis for the the Controlled Substance Act.

Researchers have consistently recognized that the form of delivery of the "active ingredient" has major physiological affects on the nature of the drug effect, requiring entirely different classifications for different forms of the same ingredients.  Cocaine as a hydrochloride salt or cocaine in the original leaf, for example, is accompanied by excipients which attenuate the drug physiological symptoms; thus, the presence or absence of excipients and the mode of delivery can dramactically affect the nature of the drug action, a fact which can only be determined generally by empirical experimentation.  The resulting technical legal consequences have been well worked out for the schedlues drug methamphetamine.

In the original 1970  Schedules, methamphetamine was separately found in both Scedule II and III.  The sole difference was the excipient medium associated with the particular drug.  Methamphetamine solutions ("injectables") were placed in Schedule II and methamphetamine powders and pills were placed in Schedule III.  Thus, the form of the drug directly dictated the scheduling based on the resulting differences of abusability the forms permitted.

The most instructive example for the form of methamphetamine affecting scheduling, however, comes from the exceptionsto scheduling entirely that were created for methamphetamine inhalers.  Both "Rynal" and "Vicks" inhalers were not scheduled at all, despite each product containing a "detectable" and even "usable" quantity of methamphetamine, the "controlled substance."  The reason for this exception was that the manufactures were able to medically demonstrate that their products, as whole drugs, were not abusable:

"[] both Congress and the F.D.A. recognize that
substances are to be judged as a whole, and not
merely by whether or not they contain one in-
gredient." United States v. Housley, 751 F.
Supp. 1446, 1447 (D. Nev. 1990).

Also see, United States v. Viernes, 763 F. Supp. 1068, 1071 (D.
Hawaii 1991), holding the same after extensive analysis of the reasons.

A similar example exists for the opium family of drugs. The opium
Schedule in 1970 had no subclassifications; today, it has eighteen,
some for distinctions seemingly as trivial to a layman as for "raw"
opium, "tincture" of opium.  It is beyond peradventure that any
fundamental difference in behavior of a drug substance is the medical
concern that triggers the mandatory scientific-medical evaluation pre-
requisite to scheduling.

The Petitioner Asks This Court To Take Judicial Notice
That Cocaine Free-Base Has Been Legally Determined To
Be A New-Drug:

In  the legitimate pharmaceutical form, cocaine free-base is
known as "Esterence."  In the late 1970's, when researchers sought
to evaluate the use of cocaine free-base formulations in the treat-
ment of rhemumatoid arthritis, they were required by law to apply
for and only work under a New Drug Application.  For specifics of
the Application, see R. Bingham and L.M. Somers, "The Treatment Of
Active Rheumatoid Arthritis And Allied Inflammatory Diseases," 15th
Annual International Congress On Rheumatology, June 26, 1981, Paris.
The Petitioner is attempting now to obtain the Federal Register ci-
tations for both the Application and the approval.

As a further demonstration that the form and administration of
the substance is critical to the appraisal whther one is dealing with
a new substance, the clinical trials for Esterene establish that
when cocaine free-base is administered by nasal insuflation it is

8

classified a s non-addictive.  "Esterene In The Treatment Of Rheuma-
toid Arthritis."  Arthritis News Today, Vol. 2, pp. 1-5, April, 1980.
By law, Title 21 U.S.C. § 811(f), the Secretary of H.H.S. informed
the  Office of Attorney General of the Application for new drug and
the corresponding information and decision to grant the N.D.A. be-
fore Esterence was made available for clinical trial.  Apparently
because of the "non-abusable as administered" classification, the drug
was not flagged for scheduling.  However, this Court may take judicial
notice from all of the above proceedings that the drug, cocaine free-
base, qualified in all medical respects to be classified as a legal
new-drug substance.

> The Attorney General Had To Be Aware From Prior
> Experience That Scheduling Of Cocaine Base And
> Crack Cocaine Were Legally Required:

Despite claims to the contrary, the definition of cocaine sub-
stances appearing in the Schedules once before failed to encompass a
form of cocaine.  Beginning in the early 1980's, the Peruvian Govern-
ment's National Enterprise of Coca began to market coca tea in the
United States.  See, "Intoxication," Ronald  K. Siegel, Ph.D., Simon
and Schuster Publishers, New York, New York, pp. 300-301 (1989).   The
Company was eventually selling millions of tea bags through mail order
and health food stores.  Eventually, the use was clinically studies
for three years by Dr. Sigel and his research group at the University
of California, Los Angeles.  The results of their study were published
in a reseach report published under peer review in the Journal Of The
American Medical Association.  "Cocaine Found In Herbal Tea, " R.K.
Siegel, et al., J.A.M.A., Vol. 255, p. 40ff (1984).  This paper drew
the attention of law enforcement officials.

Despite the conclusion of the research that coca tea represented a safe form of cocaine use, and that no tea drinker had ever become addicted, the Department of Justice sought to prosecute everyone in-volved for cocaine distribution.  It was only prevented from doing so by the simple fact that "coca tea" had never been scheduled.  In fact, although coca leaves are expressly named in Section 812(c), Schedule II(4) of the original 1970 Schedules, and the fact that coca is just chopped coca leaves, "coca tea" was not scheduled by the plain meaning of the statutory language of the Schedule.  No prosecution ever took place.

The scientific report that coca tea was non-addicting also produced a problem for the Attorney General utilizing the normal manner of scheduling.  The most reliable factor for securing a recommendation to schedule from the Secretary has always been the "potential for abuse." But that factor was apparently missing.  Instead, Justice approached Congress directly to seek a change in the language of the statutory cocaine definition.

> "The amendment sought only to clarify the defin-
> ition of coca leaves.  This is apparent from both
> the statutory language and the legislative
> history.  S. Rep. No, 225,  98th Cong., 1st Sess.
> 262-63, reprinted in U.S. Code Cong. & Admin. News
> 3182, 3444-45." United States v. Daniel, 813 F.2d
> 661, 663-64 (5th Cir. 1987).

This obscure example demonstrates that the Attorney General re-cognizes his responsibility to seek scheduling when the behavior of the substances nominally classified changes significantly from that which was classified before.

> "It does not follow than when a newly invented
> or discovered things is simply called by some

> familiar name in a statute, most nearly expressing
> the new idea, that the thing so styled is really
> the thing meant by the former word." <u>Proprietors</u>
> <u>of Bridges v. Hoboken Land Improvement Co., 1 Wall</u>
> 116, 17 L.Ed. 751 (1864).

The Scheduling of Coca Tea in this manner may have its own legal difficulties (<u>vide</u> <u>infra</u>). But the principle is certainly made that the Department of Justice recognizes the need for scheduling different substances when they are medically distinguishable from previous forms of cocaine.

> Cocaine Base and Crack Cocaine Have Both Been
> Clinically Studied By Technically Proessional
> Research Groups And Medically Adudged To Be
> New Forms Of Cocaine Drug:

The abuse of cocaine base in general and crack cocaine specifically has been professionaly studied by another research group working under the direction of Dr. Ronald Siegel. <u>Journal of Psychoactive Drugs</u>, Jeffrey H. Novey and E. Leif Zerkin, Eds. Vol. 14, No. 4, October-December, 1982. Issue Number 4 is devoted to a report by Dr. Siegel on the Phenomenon of "Cocaine Smoking, " which is characteristic of the abuse associated with cocaine base and crack. It is the conclusion of Dr. Siegel's group and the peer reviewers that this form of cocaine, i.e., base, whether isolated by complicated purification techniques or simply precipitated with baking soda, represented a smokable form of the drug un-attentuated by its accompanying excipient ingredients.

The resulting symptoms were so distinguishable from those exhibited by other forms of cocaine that the researchers named previously unknown disorder in the addicted subjects.

> "The Cocaine Smoking Disorder is a Substance

11

> Abuse Disorder (DSM-III) that is distinguished
> from both medical use of cocaine as well as
> non-medical recreational use (See Siegel 1977
> for description of these patterns).  It Pre-
> supposes a pattern of pathological use, impair-
> ment in social or occupational functioning and
> a minimal duration of one month." Ibid, p.332.

This study was published, just as the results of the results of the coca tea fiasco were known, well before the prosecution of crack cocaine defendants became the prominent issue that it did in 1986. Based on the result reported above, medical profeesionals and the legislative mechanics who draft controlled substance law would have to recognize the unmistakable scheduling significance of this result. yet, all the research work of Dr. Siegel and his group was pointedly ignored in the legislative debate of the subject. regardless, for the purpose of this argument, Jones points to these results as conclusively demonstrating that under medical criteria cocaine base and crack cocaine are both new drug substances requiring scheduling.

Conclusion To This Section Of Argument:

The determination wherther a new drug substance requires scheduling is a techical question and not a legal one. If it is a different molecule, then it is either an analogue with similar chemical structure to a substance already scheduled or a wholly different structure, i.e., with no meaningful degree of structure in common. In either case, the law would recognize that scheduling was a necessary prerequisite to control per se. When the drug is not a pure substance, the criteria for newness adjusts to the uncreased complexity. An empiracal determination must be made of how the drug behaves, just as pure drugs were evaluated before "chromatography" separations, mass spectroscopy, infrared spectroscopy, nuclear magnetic reasonance spectroscopy. By statute this determination has

12

been made the proper domain only of the professionals at the evluation unit of the Food and Drug Administration.

When consulted, the professionals are not confused by the distinction between "mixture" and "substances." When similar individuals contributed to the drafting of the original C.S.A., they were not flummoxed for the proper treatment to be afforded the "drug within a drug" situation and merely made it one of the factors to be considered, not any dispositive factors, for scheduling the newly made substance"

> (4) The drug or drugs containing such a substance are new drugs so related in their action to a drug or drugs already listed as having a potential for abuse to make it likely that the drug will have the same potentiality for abuse as such drugs, thus making it reasonable to assume that there may be significant diversions from legitimate channels, significant use contrary to or without medical advice, or that it has s substantial capability of creating hazards to the health of the user or to the safety of the community." House report 91-1444, section discussing criteria for controlling a substance, subsection discussion factors where new substance contains an already scheduled substance, p. 34.

Against it very own instincts, therefore, did Congress dispense with its own proposed scheduling by legislative fiat. All three bills proposed to become the Narcotics Penalties Act of 1986 made scheduling the first order of business. The language of Senate 2715 is representative:

> ¯Sec. 2. Addition Of Cocaine In Any Base Form As A Schedule I Controlled Substance. Schedule I of section 202(c) of the Controlled Substance Act (21 U.S.C., § 812(c) is amended by adding at the end the following:
>
> (d) cocaine in any base form.

This language was removed in the judiciary Committee at the urging of the department of justice representatives. If this suggestion was made and accepted in good faith, then it represents an intollerably unsophisticated understanding of the statutory responsibilities of the Controlled Substances Act. On the other hand, the deletion of all scheduling provis-

ions is recognizable as solving a perceived oversight to past prosecut-
ions for cocaine base and crack; they weren't yet controlled substances.
Caudle, supra. the explanation of this disingenuous action of the comm-
ittee would appear to required discovery and full evidentiary hearing.
Regardless, the action can be seen to be legally wrong. because of the
Committee's direct action, neither cocaine base nor crack cocaine as
known and understood to the public and professionals alike appear in the
Schedules of controlled substances and are not controlled.

Wherefore Jones conviction and sentence must be vacated an the
indictment dismissed.

In Circumventing The Statutory Scheduling Process Congress Violated Jones
Constitutional Due Process Rights.

The manner by which Congress treated the criminalization of Cocaine
Base has created two Constitutionally fatal defects to the Sentence and
Conviction in this case.

A. The Cocaine Base Sentencing clause, § 841(b)(1)(A)(iii) and (B)
(iii) Are Statutory Void For Vagueness:

Neither crack nor cocaine base is included on these schedules. Al-
though cocaine is included on schedule II, numerous Courts presented with
the question of whether cocaine base is equivalent to cocaine powder for
purpose of § 841(b)(1)(A)(ii) have held that the two substances are dis-
tinct:

> If we were to read clause (ii() to include cocaine base
> because cocaine base is pure cocaine, we would of
> necessity have to conclude that there was no purpose
> for including clause (iii) in the statute since that
> clause also addresses cocaine base... [I]f clause
> (iii) isolates crack cocaine for special treatment, it
> is illogical then to read (ii) also to include crack
> cocaine.

United States v. Fisher, 58 F.3d 96,99 (4th Cir 1995) cert.denied,116
S.Ct. 329 (1995). explaining the legislative history, the Court in Fisher
also stated that "one purpose of [the] Narcotics Penalties and enforcem

ent Act of 1986 "was to recognize crack as distinct and separate drug from cocaine hydrochloride." Id. (citing 132 Cong. Rec. s14, 288 [daily ed. September 30, 1986]); see also United States v. Edwards,98 F.3d 1364, 1369 (D.C. Cir. 1996), cert, denied,117 S.Ct.1437 (1997); United States v. Reddick, 90 F.3d 1276, 1282 (7th Cir. 1996); United States v. Booker, 70 F.3d 488, 493-94 (7th Cir. 1995), cert denied 116 S.Ct. 1555 (1996); United States v. Buckner, 894 F.2d 1245, 1248 (D.C. Cir. 1989); but see United States v. Davis, supra,864 F. Supp. at 1305 (definitions of terms scientifically synonmus) rev'd sub non, United States v. Sloan, 97 F.3d 1378, 1381-84 (11th Cir. 1996).

Because the scheduled definition of cocaine, however, is virtually identical to the definition of cocaine in § 841(b)(1)(A)(ii)[1] for reasons separate from those Davis cocaine base must be distinct from cocaine for purposes of scheduling to the same extent it is distinct for the purposes of § 841(b).

The Fifth Circuit in United States v. deisch, 20 F.3d 139, 149-52 (5th Cir. 1994), essentially conflates this distinction for purpose of scheduling. According to the Fifth Circuit, cocaine base is included in Schedule II's definition of cocaine. Id. at 150-51. However, that Court did not address the question presented here whether cocaine base was por-perly schedule before Congress enacted the 100:1 ratio treating cocaine

---

1. Section 841(b)(1)(A)(ii) penalizes offenses involving:

   (I) coca leaves,except coca leaves and extracts of coca leaves from which cocaine, ecgonine, and derivatives of ecgonine or their salts have been removed;

   (II) cocaine, its salts, optical and geometric; and salts of isomers;

   (III) ecgonine, its derivatives, their salts, isomers and salts of isomers; or

   (IV) any compound, mixture, or preparation which contains any quantity of any of the substances referred to in the subclasses (I) through (iii).

base as a distinct and different drug from cocaine. Instead, that Court addressed whether a charge of simple possession of cocaine base under § 844 could be a lesser included offense of a charge of possession with intent to distribute cocaine base under § 841.

if, as the Deisch Court believed, cocaine base is included in scheduled II's definition of cocaine, then it must similarly be included in the definition of cocaine in § 841(b)(A)(II) because that provision defines cocaine in exactly the terminology as Schedule II. [2] On the other hand, if-- as many Courts have held--cocaine base is not comprehended within the definition of subsection (ii) of § 841(b)(1)(A), then cocaine was never scheduled, is not a controlled substance by definition, and its use cannot be prohibited by § 841(a). [3] See e.g., United States v. caudle, supra 828 F.2d at 1112 ("defendants clearly could not be indicted for distributing a drug that was not placed on the list of controlled substances").

---

1. Con't : The definition of cocaine in schedule II of 812(c) is virtually identical to that in § 841(b), word for word. The definition of cocaine in the C.F.R. is also virtually identical, though slighty differently:

> Coca leaves [] and any salt, compond, derivative or preparation of coca leaves (including cocaine [] and ecgonine [] and their salts, isomers derivatives and salts of isomers and derivatives), and any salt, compond derivative, or preparation thereof which is chemically equivalent or identical with any of these substances, except that the extraction of coca leaves which extractions do not contain cocaine or ecgonoine.

21 C.F.R § 1308.12(b)(4).

2. In turn, if cocaine base is included in the definition of cocaine in § 841(b)(1)(A)(ii), then the rule of lenity would require all courts to apply sudsection (ii), and not subsection (iii) to all charges under § 841(a) involving cocaine base. See e.g., United v. Sloan, 97 F.3d 1378, 1382-83 (11th Cir. 1996) (rule of lenity applies "only if" distribution of cocaine base is "arguably subject to § 841(b) and [U.S.S. G.] § 2d1.1 (c)'s lower their penalties" but legislative history and purposes of sentencing scheme preclude that conclusion) cert. denied,117 S.Ct 2459 (1997); United States v. Davis,864 F.Supp. 1303, 1306 (N D Ga. 1994) but see United States v. Edwards, 98 F.3d at 1369 (no "grevious ambiguity" between cocaine and cocaine base warranting application of rule of lenity).

The ambiguity of the cocaine base crack cocaine penality scheme
violates Constitutional due process. <u>United States v. Morrisette</u>, 342
U.S. 246, 96 L.Ed2d 288, S.Ct. 240 (1952). The oversight giving rise
to this problem is that Congressional approach to the problem was backwards.

> "Section 841(b) has nothing to do with the substantive
> elements of the underlying offense."<u>United States v.
> Acevedo</u>, 891 F.2d 607, 611 (7th Cir. 1989). Also see
> <u>United States v. Mcdonald</u>, 777 F.Suup. 43, 44 (D.C.D.C.
> 1991)(collecting cases).

No amount of  rationalization now can cure this inherently defective leg-
islative approach.

    B.The Conviction In This Case Is Void For Statutory Violation Of
      Substantive Due Process:

The subject matter of the Controlled Substances Act is nothing less
than a person's constitutional right to exist in an altered mental state.
Although now largely denigrated by the values of our materialistic cul-
ture, certain subsocieties have believed the use of certain drugs achieve
communion with God. In the broader sense, psychologists recognize the ab-
solute need for the individual to be able to release stress and tension.
If people are not going to radically alter the entire fabric of their
lives, then external controls in the form of drugs carry the baggage of
broader social implication, government has intervened here, too.

But the right to exist in an altered state is intimately related to
First Amendment privileges of religion and expression of the Fourth Amen-
dment right to be left alone by government. When Congress acted in 1970,
it realized it was legislating over subject affecting core Constitutional
values and maximized every legislative element of circumspection. unless

---

3. Similary, in 1988 when Congress amended 21 U.S.C. § 844(a) to provide
a new offense for simple possession of cocaine base, cocaine base had
never been scheduled. Under that provision, simple possession of co-
caine base is treated much more harshly than possession of cocaine
powder. The  amendment to § 844 created a new offense; the 1986 Act cr-
eating the 100:1 ratio between cocaine and cocaine base created a sen-
tencing enhancement See <u>e.g</u>. <u>United States v. Michael</u>, 10 F.3d 838 (D.C. Cir.
1993).

challenged by the Government Jones will adopt the principles above as accepted by the parties without detailed support by authorities and move to the areas where dispute might exist.

The Anti-Drug Abuse Act Of 1986

In 1986, Congress passed the Anti-Drug Abuse Act (the "1986 Act"), established penalties and sentencing enhancements which specifically referenced cocaine base for the first time and adopted the 100:1 ratio between amount of cocaine powder and cocaine base subject to ten and five year mandatory minimum sentences. The atmosphere in Congress when this statute passed has been described as "frenzied." See e.g., United States v. Walls, 841 F.Supp. 24, 29 (D.C.C. 1994)(citing eyewitness account by Eric Sterling, then counsel to the House Subcommottee on Crime), aff'd in part and remaned in part, 70 F.3d 1323 (D.C. Cir. 1995), cert denied, 117 S.Ct. 90 (1996).

> The development of this omnibus was extraordinary. typically members introduce bills which are referred to a subcommittee, and hearings are held on the bills. Comment is invited from the Administration, the judicial Conference, and organizations that have expertise on the issue. A markup is held on a bill and amendments are offered to it. For this omnibus bill much of this procedure was dispensed with. The careful deliberative practicℓes of the Congress were set aside for the drug bill.

Id.

The Single Senate Committee hearing on the 100:1 ratio lasted only three and a half hours Id. at 30. The discussion at that heraing similarly reflects a sense of urgency:

> Chairman Roth. The permanent Subcommittee on Investigations meets today to examine a frightening and dangerous new twist in the drug abuse problem--the growing availability and use of a cheap, highly addictive, and deadly form of cocaine known on the street as "crack".
>
> Senator Nunn... Senator chiles... has been in the forefront of those who early on identified crack cocaine as an unprecedented peril to the health and well-being of our nation... Law Enforcement Officaals... tell me that crack cocaine constitutes the most dangerous drug that they

> have ever confronted... Crack hit our society with a sud-
> denness unprecedented in the history of illict drug use.
> Literally an overnight phenomenon, crack caught many police
> agencies by surprise.
>
> Senator chiles... Eight months ago I had never heard of
> crack cocaine... [T]he carnage[this drug] is going to
> leave in its path... is something I don't know if this
> can literally survive. I have never seen law enforcement
> as concerned or frustrated or upset as I see them in my
> State everywhere I go... This thing is a tidal wave that
> has hit everywhere...
>
> [In prepared statement] we are familiare with cocaine; it
> has been with us for a long time. Crack, however, is
> something altogether different.

"Crack" Cocaine: Heraing before the Permanent Subcommittee on Investigat-

ions of the Senate Committee on Government Affairs, 99th Cong. 2d Sess.

20 (1986)(hereinafter "Crack Cocaine Hearing") at 1-8 (emphasis added).

Congress considered crack to be a new drug. In fact, Senator Chiles

introduced a bill to schedule cocaine base independently of cocaine, on

Schedule I:

> Mr. President, one of the bills I am introducing today is
> to move rock cocaine to the class I schedule under the
> Controlled Substances Act. That makes it a very, very
> severe penalty.

It contained the scheduling provision discussed earlier:

S. 2560

> Be it enacted by the Senate and House of Representatives of
> the United States of America in Congress Assembled, That(a)
> Schedule I of section 202(c) of the Controlled Substabces
> Act is amended by adding at the end there of the following:

"(d) Cocaine freebase"

S. 2560, 99th Cong., 2d Sess. (1986) Cong. Rec. 14098-99 (daily ed. June

17, 1986); see also Crack Cocaine hearing at 10. Though this bill was

never passed, and setting aside the question of whether Congress had the

authority to explicitly bypass the scheduling requirements of § 811 and

812 (see discussion infra),the introduction of this bill demonstrates

recognition by Congress that cocaine base should have been scheduled in-

dependently of cocaine (which is listed on Schedule II).

Instead, however, acting in haste and ignoring the past legislative experience with coca tea, Congress enacted extraordinarily severe sentences for offenses involving cocaine base without scheduling it as a new controlled substabce as required.

Congress Violated The Equal Protection Rights Of The United States Constitution by Circumventing § 811 and 812 Creating a 100:1 Penalty Ratio For Cocaine Base Without Any Medical-Scientific Evaluation In Contrast To Every Other Scheduled Drug:

For the reason stated below, this Court should not uphold the circumvention of the scheduling procedures   in  § 811 and 812 by the United States Congress.

The Plain Language Of § 811 and 812 Does Not Authorize Congress To Schedule Drugs Or To Circumvent The Established Scheduling Procedures:

Pursuant to § 811(a), all new substances must be scheduled by the Attorney General.

The Attorney General shall apply the provision of this subchapter to the controlled substances listed in the schedules established by section 812 of this title and to any other drug or other substance added to such schedule under this subchapter...

(Emphasis added). Section 812(b) further states:

Except where control is required by United States obligations under an international treaty, convention or protocol, and except in the case of an immediate precursor, a drug or other substance may not be placed in any schedule unless the finding required for such schedule are made with respect to such drug or other substance.

(Emphasis added). This language does not permit a drug to be scheduled or otherwise controlled except by the Attorney General, and he must utilize the procedures established by § 811 and 812. therefore, even if Congress had the constitutional authority to circumvent the scheduling procedures (see discussion below), that circumvention conflicted with the plain language of the statute.

Congress Violated The Separation Of Powers by Legislating More Severe Penalties And New Offenses For Cocaine Base Without Scheduling Cocaine Base Pursuant to § 812:

After Congress had established procedures for revising the sched-
ules and delegated authority those revisions to the Attorney General,
it was an infringement on the executive function to impose severe sent-
ences on violation involving a new controlled substance without following
the statutorily  required scheduiling procedures. Having most deliberately
established a regulatory vehicle, Congress can thereafter only control
execution of its  enactment indirectly by repeal or amendment. Bowsker
v. Synar, 478 U.S. 714, 106 S.Ct. 3181, 92 L.Ed2d 583 (1986).

Once congress has delegated its authority, "Congress must abide by
its delegation of authority until that delegation is legislatively al-
tered or revoked." Immigration and Naturalization v. Chadha,462 U.S. 919,
955 (1983). In Chadha,the court struck down a one-house legisative veto
which Congress had retained over the Attorney General's decision to sus-
pend deportation of an alien, noting that "[e]xecutive action under leg-
islatively delegated authority... is always subject to check by... the
power of Congress to modify or revoke the authority entirely." Id. at 953,
n. 16.

The D.C. Circuit has simlilary stated that:

> "Congress" duty to oversee agency action is connected with
> its ultimate power of revising the laws under which the
> agency operates. The creation of further power violates
> the Constitution.

> "If Congress  has given away too much power, it may by stat-
> ute take it back or may in the future enact more specific
> delegations."

Consumer Energy Council of Amer. v. Federal Energy Reg. Comm'n, 673 F.2d
471 & 476 (D.C. Cir. 1982), aff'd, 463 U.S. 1216 (1983).

this limit to congressional powers under separation of powers prin-
ciples applies to executive action that is legislative in nature, in add-
ition to that which is executive or judicial in nature. Id., at 472-473.

Though the Supreme Court's decision in Chadha turned on the unicam-

eral nature of the legisative veto at issue in that case, the Court did
not explicity reject the reasoning of the Ninth Circuit, which had de-
cided Chadha on separation of powers grounds that were independent  of
failure of the one--house veto to fulfill the requirements of Article I.
See chadha v. INS, 634 F.2d 408, 433 (9th Cir. 1980). As the Ninth Cir-
cuit Stated:

> "The Executive evolves its skills and ecpertise from the
> administration of a statute over time. This process can be
> thwarted if legisative interference, constant in its
> potentiality, can be exercised in any given case without a
> change in the general standards the legislature has initial-
> ly decreed.

> "Summary reversal of the executive's decision by the Legis-
> latture in a single case, without an indication of a need
> to change the standards or general rules to be applied,
> detracts from the authority of the second branch, and to
> that extent undermines its powers."

Id., at 432.

     In the Anti-Drug Abuse Act, Congress did not explicitly state it
was circumventing the scheduling procedures, or that it intended to exempt
cocaine base from the scheduling requirements of § 811 and 812, nor did
it direct a particular scheduling result. For that reason, this case is
distinguishable from certain instances in which congressional legislation
directing specific agency action has been upheld. See e.g., First Gibralter
Bank v. Morales, 42 F.3d 895, 901 (5th Cir. 1995); Stop H-3 Ass'n v. Dole,
870 F.2d 1419, 1433-36 (th Cir. 1989). Furthermore, because Congress did
not amend § 811 and 812, this case is distinguishable from the type of
legislation upheld in Robertson v. seattle Audubon Soc.,503 U.S. 429 (1992).
That case involved legisalation which directed that compliance with cer
provisions of law (limiting timber sales in national forests known to be
the habitats of northern spotted owls) would also satisfy earlier pro-
vision of law that formed the basis for three on going cases, which the

22

statute mentioned by name. The Court interpreted that statute as an amendment to existing law, rejecting the Ninth Circuit's holding that the statute violated Article III of the Constitution by directing the outcome of litigation. Id., at 437-38.

### The Circumvention Of Scheduling Requirements By Congress Violated Due Process And equal Protection:

The scheduling procedures enacted in § 811 and 812 provide the public with procedural protections, including the consideration of scientific and medical expertise, notice and comment, and a public hearing on the record under the Administrative Procedure Act. This grants an "opportunity for consideration of the views of person who would be adversely affected by control of a drug, with judicial review available therefore," and assure the Attorney General's authority is "subject to public and judicial scrutiny and also grounded in scientific evidence." Pastor,491 F.Supp. at 1338-39 (citing H.R. Rep. No. 91-1444, Sept. 10, 1970, quoted in 1970 U.S. Code Cong. and Admin. News, at 4589. The public has frequently taken advantage of this opportunity. See, e.g., Alliance For Cannabis Therapeutics v. Drug Enforcement Admin., 930 F.3d 936 (D.C. Cir. 1991); Norml v. Ingersoll, 497 F.2d 238 (1st Cir. 1987). The defendant has a right to challenge an administrative failure to comply with scheduling  laws under the Fifth Amendment. See e.g., Touby, 500 U.S. at 169-71 ("Because of the sever impact of criminal laws on individual liberty, I  believe that an opportunity to challenge a delegated lawmaker's comliance with congressional directives is a Constitutional necessity...") (marshall, J., concurring); United States v. Forbes, 806 F.Supp. 232, 234 & 239 (D. Colo. 1992).

> "The notion of fair play animating[the Fifth] Amendment
> precludes an agency from promulgating a regulating affecting individual liberty or interest, which the rule-
> maker may then with impunity ignore or disregard as it

> The [agency] may notfairly administer [] laws
> on the notion that on some occasions its rules
> are made to be broken."

Montilla v. Immigration and Naturalization Service, 926 F.2d 162, 164 (2nd Cir. 1991). The same considerations should apply to Congress where Congress has bypass statutorily established administrative procedures without first withdrawing or modifiying the delegated authority to administer the statutory scheme.

In a analogous context, Congress violates due process it taints or otherwise interferes with administration decision, See, e.g., ATX, Inc. v. United States Dept. of Transp., 41 F.3d 1522, 1527 (D.C. Cir. 1994); D.C. Cir.) cert. denied, 405 U.S. 1030 (1972). ATX and Volpe involved attempts by individual members of congress to influence administrative process without modification or withdrawal of the delegated administrative authority. Nonetheless, due process rights in the scheduling procedures had been established and were violated when those procedures were bypassed by Congress for this one singular drug.

despite common acceptance that procedural due process does not attach to the legislative function, at least one author has proposed that "such a reading of the Due process Clause seems facially wrong:

> A proper analysis should begin with the proposition that
> limting the reach of procedural due process to adjudica-
> tion does not accord with the Constitution's test. The
> point seems self-evident because the Due Process Clause
> are routinely applied to the legisative decision that
> affect the rights and responsibilities of persons out-
> side Congress deny liberty arbitrarily if such decisions
> are made under conditions in which no attention is given
> to the rudiments of sound decision-making policy."

Peter M. Shane, Commentary, Back To The Future Of The America State: Overruling Buckley v. Valeo and Other Madisonian Steps, 57 U. Pitt. L. Rev. 443, 456 (1996). Shane views the imposition of some deliberative formality on the legislative process as consistent with Madisonian Constitutionalism, though he also recognizes that it might present a

political question beyond the reach of the Courts. Id., at 455-57. "What is, I think, most maddening about Congress in its all-too frequent inattention to fact in the legisative process and its willingness to make sweeping policy changes in the absence of virtually any informed debate among the citizenry." Id., at 454.

"[D]ue Process is flexible and calls for such procedural protect-ions as the particular situation demands." Matthews v. Eldridge, 424 U.S. 319, 334 (1976)(citing Morrisey v. Brewer, 408 U.S. 481 (1972).

> "[D]ue Process generally requires consideration of three distinct factors: first, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the proable, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the addition-al or subsitute procedural requirement would entail."

Id., at 335 (citing Goldberg v. Kelly, 397 U.S. 254, 263-64 (1970).

Following the scheduling procedures required under § 811 and 812 would not have entailed any financial, fiscal, or administrative burden. Congress had already created specific emergency procedures for the prompt temporary scheduling of new "Designer" drugs, precisely to address the situation where "drug traffickers were able to take advantage of [the time necessary to schedule a drug] by designing drugs that were similar in pharmacological effect to schedule substances but differed slightly in chemical composition so that the existing schedules did not apply to them" Touby v. United States, 500 U.S. 160, 163 (1991). These emergency procedures could have been used to schedule cocaine base in accordance with law, but they were not.

Jones was sentenced under 21 U.S.C. § 841(b)(1)(A)(iii) (penalizing possession and distribution of "Cocaine Base") Although Congress estab-lished separate penalties for cocaine base/crack cocaine under 21 U.S.C.

sec. 841(b)(A)(iii) and (B)(iii) in 1986, Cocaine Base was a new drug that had never been schedule as a controlled substance listed in schedule II of Title 21 U.S.C. sec. 812 as required by 21 U.S.C. sec 811 and 812 )defined in 21 U.S.C. sec. 802(5)(6)). accordingly, the sentencing Court did not have jurisdiction to sentence Jones pursuant to Sec. 841(b)(1)(A)_ (iii), for possession and distribution of cocaine base commonly known as crack cocaine when the same has never been scheduled as controlled sub-stance listed in Schedule II of Title 21 U.S.C. sec. 812.

**Wherefore Jones avers this conviction and sentence are jurisdiction-ally defective and the sentence must be Vacated and the Indictment dis-missed.**

Respectfully Submitted,

Mark Anthony Jones
Reg.No: 10997-017

## CERTIFICATE OF SERVICE

I, hereby certify under penalty of perjury that a copy of this Rule 60(b)(6) motion, has been served on opposing counsel, Michael T. Simpson, Assistant United States Attorney, 111 North Adams St, 4th Floor, Tallahassee, Florida 32301, on this _6_ day of September 2005, by placing said document in a properly addressed envelope with postage prepaid and placing said envelope in the Prison legal Mailbox.

Respectfully Submitted

Mark Anthony Jones
Reg. No: 10997-017
Defendant pro-se
Federal Correction Complex
Post Office Box-1032
Coleman-Medium
 Coleman, FL 33521-1032